**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| CHRISTINE RENEE SECREST, | CASE NO. 5:23-CV-1228 |
| Plaintiff, | JUDGE SARA LIOI |
| vs. | |
| COMMISSIONER OF SOCIAL SECURITY, | MAGISTRATE JUDGE AMANDA M. KNAPP |
| Defendant. | **REPORT & RECOMMENDATION** |

Plaintiff Christine Renee Secrest ("Plaintiff" or "Ms. Secrest") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I.      Procedural History

Ms. Secrest filed an application for SSI on October 23, 2018.  (Tr. 73, 96-97, 116, 193, 775, 829, 841, 869.)  She alleged a disability onset date of June 2, 2016, due to postural orthostatic cardiac syndrome, back pain, spinal stenosis, degenerative disc disease, back surgeries, hypertension, peripheral artery disease, bipolar, depression, mood disorder, GERD,

ulcerative colitis, Barrett's Syndrome, Raynaud's phenomenon.[1]  (Tr. 775.)  Her application was

denied at the initial level (Tr. 119-27) and upon reconsideration (Tr. 131-35).  She requested a

hearing.  (Tr. 136-38.)  A hearing was conducted before an Administrative Law Judge ("ALJ")

on March 17, 2020.  (Tr. 273-307.)

The ALJ issued an unfavorable decision, finding Ms. Secrest had not been under a

disability from October 23, 2018,[2] through the date of the decision.  (Tr. 7-23.)  The Appeals

Council denied Ms. Secrest's request for review on October 30, 2020, making the ALJ's decision

the final decision of the Commissioner.  (Tr. 1-6.)  Ms. Secrest filed an appeal with the United

States District Court for the Norther District of Ohio, resulting in a remand of her case on

November 4, 2021.  (Tr. 840.)  The Appeals Council issued an Order of Appeals Council:

Remanding Case to Administrative Law Judge ("Remand Order").  (Tr. 850-56.)  The Remand

Order vacated and remanded the case based on the ALJ's inadequate evaluation of: (1) the

administrative medical findings of state agency psychological consultants Aracelis Rivera,

Psy.D., and Paul Tangeman, Ph.D.; and (2) Ms. Secrest's severe migraine headache disorder.

(Tr. 852-53.)  Upon remand, the ALJ was instructed to give further consideration to the migraine

headache impairment and the medical source opinions and prior administrative medical findings,

including those of Drs. Rivera and Tangeman.  (Tr. 853.)

A telephonic hearing was held before an ALJ on February 10, 2023.  (Tr. 790-827.)  The

ALJ issued an unfavorable decision on March 20, 2023.  (Tr. 765-789.)  No appeal was filed

with the Appeals Council, making the ALJ's decision the final decision of the Commissioner.

---

[1]  The record contains different versions of alleged impairments upon which Ms. Secrest's application was based.
(Compare Tr. 74 with Tr. 829.)  The alleged impairments listed herein is the most comprehensive list provided.  (*See*
Tr. 829.)
[2] Because Ms. Secrest has applied for SSI and these benefits are payable only as of the month after the month of
application, *see* C.F.R. § 416.335, the relevant period starts with the application date.

(ECF Doc. 1, p. 2.)  Ms. Secrest then filed the instant appeal on June 21, 2023 (ECF Doc. 1), which is fully briefed (ECF Docs. 8, 10, 11).

**II.      Evidence**

**A.      Personal, Educational, and Vocational Evidence**

Ms. Secrest was born in 1973.  (Tr. 18, 73, 780.)  She was 45 years old on the alleged disability onset date, making her a younger individual.  (Tr. 18, 780.)  At the time of the 2023 hearing, she lived with her youngest daughter.  (Tr. 802.)  She has at least a high school education with no past relevant work.  (Tr. 779.)

**B.      Medical Evidence**

Although the ALJ identified severe physical and mental impairments (Tr. 770), Ms. Secrest focuses her appeal on her mental impairments, headaches, and lumbar spine impairments (ECF Doc. 8).  The evidence summarized herein therefore focuses on those impairments.

**1.      Relevant Treatment History**

**i.      Physical Impairments**

On November 21, 2017, Ms. Secrest was called by Joyce Henke, RN, on behalf of Fredrick Jaeger, D.O. and the Cleveland Clinic to provide test results.  (Tr. 275.)  RN Henke noted that Ms. Secrest's circulation was faster than normal.  (*Id*.)  She was found to have orthostatic hypotension, which meant that her blood pressure was lower than expected when she sat up.  (*Id.*)  NP Henke left this information in a voice message, asking Ms. Secrest to call back and make an appointment with Dr. Jaeger.  (Tr. 275-76.)

In an April 28, 2018 appointment with Amjad Iqbal, M.D., of Advanced Cardiovascular Center, Ms. Secrest reported a history of POTS, bipolar disorder, GERD, hypertension, Barrett's esophagus, and biliary stenosis.  (Tr. 313.)  Ms. Secrest stated that she currently had no

3

physician, and sought treatment for a racing pulse, fatigue, swelling, night sweats, shortness of breath, and prescription needs.  (*Id*.)  He prescribed metoprolol succinate ER, restarted Toprol, and advised a follow-up in six weeks.  (Tr. 314.)  Dr. Iqbal saw Ms. Secrest for a follow-up on June 7, 2018, and treated her for hypertension, postural orthostatic tachycardia syndrome ("POTS"), and swelling.  (Tr. 311.)  Ms. Secrest complained of intermittent dizziness and lightheadedness.  (*Id*.)  Physical examination findings were unremarkable.  (Tr. 312.)  The treatment plan was to continue current medications and schedule a follow-up visit.  (*Id.*)

On October 22, 2018, Ms. Secrest attended an appointment with Karman Dhatt, M.D., a family medicine provider, with chief complaints of severe hip and shoulder pain.   (Tr. 322.)  Physical examination findings were unremarkable except for some tenderness to palpation in her left scapular muscles and greater trochanter.  (Tr. 322-23.)  Ms. Secrest related her hip pain to a recent fall, but said she could bear weight like normal.  (Tr. 322.)  Dr. Dhatt diagnosed POTS, migraine without status migrainosus, and muscle strain of the left scapular region.  (Tr. 323.)  He restarted Promethazine HCI for POTS, started Imitrex for migraines, started Baclofen for muscle strain, and ordered x-rays of her left shoulder and left hip.  (*Id*).  The x-rays revealed minimal degenerative changes to her left shoulder, and no acute process—including no fracture, dislocation, or soft tissue injury—in her left hip.  (Tr. 341-42.)

At a follow-up visit with Dr. Dhatt in November 2018, Ms. Secrest complained of chronic pain related to her prior cervical and lumbar spine surgeries, which was not controlled with Tylenol.  (Tr. 319-320.)  Dr. Dhatt noted that she was no longer following up with her neurosurgeon or orthopedic surgeon.  (Tr. 319).  Examination revealed no edema in the legs and no focal neurological deficits, but she had bruising on her palm and foot which did not seem to be from any trauma. (*Id*.)  Dr. Dhatt diagnosed hypertension, bruising, and cervical

radiculopathy; he prescribed lidocaine topical gel and referred Ms. Secrest to pain management for chronic pain secondary to cervical and lumbar surgeries because of spinal stenosis.  (Tr. 320.)

On December 20, 2018, Ms. Secrest was seen by Jennifer Drake, D.O., a neurologist with NeuroCare Center, reestablishing care with Dr. Drake after three years without visits.  (Tr. 374-379).  She complained of a five-month history of daily headaches that were aggravated by light and sound and associated with symptoms of feeling as if her head/face were on fire, nausea associated with smells, and irritability.  (Tr. 374.)  Ms. Secrest stated that Imitrex was not working as well as in the past, and Tylenol—which she took every day for back pain—was of mild help.  (*Id.*)  Dr. Drake documented Ms. Secrest's description of her headaches:

> headaches often start in occipital region—often trigger[ed] by her jerks[,] then spreads to bifrontal; increased nausea, BP elevated, photophobia; and sensitive to smell; couple times a w[ee]k; last hours; she teaks Tylenol or Imitrex helps if taken early.

(Tr. 375.)  Ms. Secrest also reported tremors and tics which were characterized by her head tilting to the side, throat grunting and face grimacing; these were her most problematic issue as they caused neck pain.  (*Id.*)  No objective examination findings were provided, except for vital signs which were unremarkable.  (Tr. 377.)  Dr. Drake diagnosed insomnia, anxiety, migraine, tic disorder, restless leg syndrome and body mass index ("BMI") 34.0-34.9.  (Tr. 377-78.)  She prescribed gabapentin for restless legs, discussed sleep hygiene, and recommended titrating off Phenergan in case the tics were a medication side effect.  (*Id.*)  For migraines, Dr. Drake prescribed Almovig injections for migraine prevention and a trial of Maxalt at onset for severe headaches, restarted Depakote, and instructed Ms. Secrest to reduce Tylenol use.  (Tr. 377.)

On December 27, 2018, Ms. Secrest went to the emergency department at Aultman Hospital.  (Tr. 422.)  She reported low back pain with associated thigh pain and urinary incontinence.  (*Id.*)  Timothy Cooley, M.D., treated Ms. Secrest, and ordered an MRI and x-ray

of her spine.  (Tr. 427.)  Imaging showed "L4-L5 disk protrusion as well as foraminal stenosis in L5-S1" for which she was admitted under critical care "due to the high probability of death and deterioration given patient's condition. . . ."  (*Id*.; *see* Tr. 436-39.)  Ms. Secrest was admitted into the hospital, with diagnoses of: bilateral sciatic pain with urinary incontinence secondary to L4-L5 central disk hernia; cauda equina secondary to; moderate foraminal stenosis of L5-S1; history of hypertension; and hyperglycemia.  (Tr. 427-28.)

Upon admission, she was treated by orthopedic surgeon Jared Stefanko, D.O., for severe spinal stenosis at L4-L5 with disk herniation L4 to L5 and cauda equina syndrome.  (Tr. 429-30.) Dr. Stefanko performed a revision decompression and diskectomy at L4-L5.  (Tr. 430-432, 450-53.)  Ms. Secrest did well after surgery, with resolution of her leg pain and urinary incontinence, but with some expected post-surgical back pain.  (Tr. 429, 451.)  She was discharged on December 29, 2018, with instructions to follow up in two to three weeks.  (*Id.*)

Ms. Secrest attended a surgical follow-up appointment with Marcia Grossman, PA-C at Dr. Stefanko's office on January 11, 2019.  (Tr. 441-44.)  She reported immediate improvement of her symptoms when she woke from surgery; the shooting pain down her leg was gone, her left hip pain was resolved, and she was able to urinate better.  (Tr. 441.)  Physical examination revealed good movement of arms and legs, normal strength throughout, and no edema, erythema, or pain in her legs.  (Tr. 442.)  PA-C Grossman concluded that she was doing well following her surgery; she reduced Ms. Secrest's dosage of pain medication, continued her muscle relaxant, and advised her to continue wearing her back brace when engaging in activities.  (Tr. 443.)

At a May 29, 2019 cardiology appointment with Dr. Iqbal, Ms. Secrest complained of continuing problems with dizziness and lightheadedness with the heat, a heart rate around 100, and slightly elevated blood pressure.  (Tr. 739.)  On examination, her BMI was 33.6, her pulse

6

was 100 (regular), and her blood pressure was 148/100.  (*Id.*)  Dr. Iqbal diagnosed POTS, sinus tachycardia, palpitations, and autonomic nervous system dysfunction with orthostatic hypotension.  (Tr. 740.)  He ordered an EKG, continued her on the same medications, and recommended and increase in fluids and a follow-up appointment in four months.  (*Id.*)

Ms. Secrest returned to her cardiology practice on January 15, 2020, where she was seen by Richele Smart, CNP.  (Tr. 754-55.)  She complained that she remained tachycardic and felt her heart racing quite frequently; she also reported developing fatigue, shortness of breath, and chest pain with exertion.  (Tr. 754.)   On examination, her BMI was 32.23, her pulse was 108 (regular), and her blood pressure was 127/88. (*Id.*)  CNP Smart diagnosed: POTS; sinus tachycardia, uncontrolled; palpitations, uncontrolled; chest pain, shortness of breath, and fatigue; and autonomic nervous system dysfunction with orthostatic hypotension.  (Tr. 755.)  She increased Cardizem CD and ordered labs, echocardiogram, and exercise testing.  (*Id*.)

On July 4, 2020, Ms. Secrest presented at the emergency department of Aultman Hospital, complaining of right sided back pain (rated 9/10) starting four days before, with some urinary incontinence.  (Tr. 1214-18.)  She reported using a walker to ambulate, but said she was having much difficulty and basically could not walk significantly.  (Tr. 1214.)  On examination, she had significantly decreased motor strength in the right lower extremity and could not significantly raise the right lower extremity with a straight leg raise.  (Tr. 1215.)  She said she initially presented to the emergency department at Mercy Hospital on July 1, 2020, complaining of severe back pain and right lower extremity pain with intermittent paresthesias, but was prescribed prednisone and discharged; she reported using a walker since that time.  (Tr. 1176.)

A lumbar MRI was ordered, and Ms. Secrest was admitted to Aultman Hospital with diagnoses of disc impingement, cauda equina syndrome, and urinary incontinence.  (Tr. 1214.)

Her neurological examination upon admission revealed marked weakness in her right dorsi and plantar flexors, marked numbness in her right instep and the sole of her foot, with markedly diminished sensation on the right side of her pubic region. (Tr. 1178.) The lumbar MRI revealed moderate to severe central canal and bilateral lateral recess stenosis at L4-L5 that seemed worsened compared to the earlier study due to a new superimposed right-sided disc extrusion. (Tr. 1236-37.) This was characterized as "a large caudally migrated L4-L5 disc herniation on the right." (Tr. 1176.) Neurosurgeon Mark Weiner, M.D., performed an urgent redo of her right L4-L5 laminectomy and discectomy with an instrumented fusion on July 5, 2020. (Tr. 1176-77, 1245.) Her diagnosis was multiply recurrent disc herniation right L4-5 with diastatic L4-L5 facet joints and near cauda equina syndrome. (*Id.*)

Ms. Secrest was discharged from Aultman Hospital on July 8, 2020. (Tr. 1176-77.) She reported continued numbness in the right foot, hip, and thigh following her operation, but with improved movement of her lower extremities. (Tr. 1176.) She continued to have extremely weak dorsiflexion and plantarflexion on the right, but reported it was improved compared to preoperatively. (*Id.*) She was up and ambulating with physical therapy using a walker. (*Id.*) She was urinating without difficulty, and reported she had sensation to void, which she did not have prior to surgery. (*Id.*) Erika Swartz, APRN-CNP, and Dr. Weiner indicated that Ms. Secrest was much improved after her surgery, but would continue to need therapy for lower extremity strengthening. (*Id.*) She was fitted with a back brace, given discharge instructions and restrictions, and instructed to return for follow up in four weeks. (Tr. 1176-77.)

Ms. Secrest did not attend her scheduled post-operative follow-up, but returned for a neurosurgery follow-up with Kathleen Wright, APRN-CNP, on September 17, 2020; she did not get the x-ray scheduled for that day, however. (Tr. 1421-24.) Ms. Secrest complained that she

felt like "fire," was red and puffy, and felt like there was fluid; she also complained that both of her feet were swollen, her toes turned purple, and she could not walk.  (Tr. 1421.)  But she also reported "dramatic improvement compared to prior to her surgery," and denied new weakness or new numbness or tingling.  (*Id.*)  She said she wore her back brace as much as possible, and CNP Wright reviewed with her the importance of wearing her lumbar brace when she was up and about.  (*Id.*)  Physical examination revealed:  4/5 strength in the right leg and 5/5 strength in the left leg and ambulation without difficulty.  (*Id.*)  CNP Wright prescribed a week's supply of pain medication, and advised Ms. Secrest to have the x-ray and return in one month.  (*Id.*)  There is no evidence that Plaintiff returned for further follow-up.

Ms. Secrest had an appointment with Jason Van Soelen, M.D., a family medicine provider, on September 29, 2020.  (Tr. 1158.)  Ms. Secrest complained of "pain and redness" in her hands and feet which started about five months prior; she complained of parasthesias in her hands and feet while sleeping, as well as cold fingertips and toes.  (*Id*).  She reported that her surgeon told her these symptoms were not a result of surgery.  (*Id.*)  An examination revealed normal range of motion and strength in her legs, but delayed capillary refill in all digits as well as mildly decreased sensation in fingertips.  (Tr. 1159).  Dr. Van Soelen assessed her with Raynaud's phenomenon without gangrene.  (*Id.*)

At an October 2020 telehealth follow-up visit with Dr. Van Soelen, Ms. Secrest continued to complain of hand and foot pain associated with Raynaud's.  (Tr. 1156.)  Quitting smoking did not alleviate her symptoms.  (*Id.*)  Ms. Secrest denied having a headache but endorsed a history of headaches.  (*Id.*)  Dr. Van Soelen ordered an EMG and ankle-brachial index test as follow-up measures.  (Tr. 1157.)

Ms. Secrest denied gait disturbance at mental health visits from October 2020 through January 2021.  (*See* Tr. 1255, 1264, 1275, 1295.)  In November 2020, approximately four months after her last lumbar spine surgery, Ms. Secrest reported that she was in the process of remodeling her house, and had been cleaning, painting rooms, and redoing furniture—reporting that she was feeling manic at the time.  (Tr. 1276, 1284; *see also* Tr. 1404 (bipolar diagnosis).)

### ii.      Mental Impairments

In November 2018, Ms. Secrest was seen at Phoenix Rising Behavioral Health and Recovery for an intake visit with Adrienne Roth, LPCC.  (Tr. 404-418).  She reported having filed for disability benefits due to physical impairments, but she also reported suicidal ideation without a plan, an inability to handle stress well, frequent anger often, and being excessively tired most days.  (Tr. 404, 411.)  Ms. Secrest said she lived with her two children (ages 10 and 17), who were the only thing that kept her going.  (Tr. 404-05, 416; *but see* Tr. 411 (reports that daughter lives with grandmother).)  She left her last job as an assistant at a construction company in 2016 due to transportation issues.  (Tr. 407.)  Her trauma history included physical, verbal/emotional, and sexual abuse, with suicidal ideation and attempt.  (Tr. 407, 410, 416.)  Ms. Secrest acknowledged smoking marijuana multiple times per day.  (Tr. 408.)  A mental status examination revealed a normal appearance, average eye contact, cooperative behavior, a euthymic mood, a full affect, clear speech, logical thought process and content, normal perception, no evidence or report of hallucinations or delusions, normal cognition, estimated above average intelligence, and normal insight and judgment.  (Tr. 409-410.)  She was assessed with bipolar disorder.  (Tr. 417.)

Ms. Secrest then engaged in individual psychotherapy at Phoenix Rising from December 2018 through February 2019.  (Tr. 396-403, 678-687, 692-696, 1287-1290.)  During this period,

she reported some ongoing symptoms and stressors, including suicidal ideation, signs of mania, her son's hospitalization due to ongoing medical issues, and relationship issues with her boyfriend.  (*See* Tr. 682, 686, 695.)  Her mental status examinations through February 2019 were unremarkable.  (*See* Tr. 397, 409-410, 679, 684, 693.)  In March 2019, Ms. Secrest was discharged after she failed to schedule any further appointments and did not return phone calls to schedule.  (Tr. 677.)  The discharge summary stated that some progress had been made toward the goals of treatment and that Ms. Secrest had been "semi-compliant."  (*Id.*)

In September 2020, about a year and a half after being discharged, Ms. Secrest resumed treatment with Phoenix Rising, reporting that she wanted to get back on her medication due to worsened symptoms:

> [Ms. Secrest] reported that she is doing way worse now than she did before. She reported that the stress in her life makes everything worse. She reported feeling like she's about to snap, she's seeing things, has shifts in mood, feels on edge, is set off by anything and is not sleeping. Client also reported that she doesn't eat much, feels anxious and her facial tics have now moved to her hands. Client reported that she has a love hate relationship with her shower curtain and her bedroom curtain makes her feels like someone is coming. She has nightmares and sometimes she's so scared that she starts to cry.

(Tr. 1302.)  Ms. Secrest also reported that: her 12-year-old daughter recently ran away from home and got in trouble with the police; she was worried her daughter would be "raped or murdered"; her mind raced; and she experienced pain from time to time from spinal surgeries. (Tr. 1302-03, 1317.)  The intake mental status examination revealed rapid speech, anxious mood, paranoid thoughts, and reports of visual hallucinations.  (Tr. 1309.)  Ms. Secrest stated that she had suicidal ideation two weeks prior but "would never do anything because she believes in hell and doesn't want to go to hell," and because of her kids.  (Tr. 1309-10.)  She was referred for behavioral and medication treatment.  (Tr. 1319.)

11

At a psychotherapy appointment on October 22, 2020, Ms. Secrest was alert and engaged.  (Tr. 1290).  She reported hallucinations and confirmed suicidal ideation, plan, or intent, but said it was something she would never do.  (*Id*.).  She remained worried about her daughter.  (*Id*.)  Later that month, during a home visit on October 27, 2020, Ms. Secrest was noted to be inconsistently taking her medications and attending scheduled appointments for both her mental and physical health.  (Tr. 1285-1286.)

Ms. Secrest was also seen at Phoenix Rising for medication management visits in December 2018 and June 2019, and from September 2020 through January 2021.  (*See* Tr. 387-395, 1255-1271, 1275-1282, 1291-1301, 1320-1327.)

During her initial visit in December 2018 with Stephanie Martin, APRN-CNS, she reported that she had been off her medications for a few months, but still had some Vistaril which she took as needed.  (Tr. 388.)  She reported symptoms of depression, anxiety, irritability, and up and down energy.  (*Id*.)  She described stressors related to her 12-year-old daughter who had run away from home, and noted that her teenage son had autism.  (Tr. 1292.)  She stated that she typically smoked marijuana twice a week to calm herself down and to aid with sleep.  (Tr. 390.)  APRN Martin prescribed Vraylar and Effexor.  (Tr. 394-95.)

In psychiatric medication management appointments, Ms. Secrest's mental status examinations revealed a normal appearance, average eye contact, average activity, and cooperative behavior.  (*See* Tr. 1266, 1322).  She usually had clear speech (except for one occasion), logical thought process (except for one occasion), normal perception, no reported delusions, normal cognition, estimated average intelligence, and normal/good insight and judgment.  (*See* Tr. 1257-1258, 1266-1267, 1277, 1281, 1296, 1322).  Her mood was variously described as "depressed, anxious, and irritable" (Tr. 1322), "depressed" (Tr. 1296), "blah" (Tr.

12

1266), and "content" (Tr. 1257). Her affect was described as full (Tr. 1257, 1266, 1322) except for one occasion when it was "flat" (Tr. 1296).  At times, Ms. Secrest reported hallucinations in the form of seeing "shadow people" in the corner of her eye, (Tr. 388, 1256-1257, 1265-1266, 1292, 1296), but on other occasions, she denied hallucinations and/or was found to have normal thought content during her mental status examinations (Tr. 1257-1258, 1266-1267, 1277, 1281, 1296, 1322).  On some occasions, Ms. Secrest reported suicidal ideation (Tr. 388, 1257); however, she usually denied suicidal ideation and consistently denied any intent or plan (Tr. 388, 1257-1258, 1266-1267, 1277, 1281, 1296, 1322).  During this period, Ms. Secrest's medication was adjusted several times.  (*See* Tr. 394-395, 690, 1260-1262, 1269-1270, 1280-1281, 1298-1300, 1325.)

In a May 2021 call made by Phoenix Rising to Ms. Secrest to follow-up on missed appointments, she reported that she stopped coming due to lack of transportation, but also reported that she was doing "fine" and had no suicidal ideation.  (Tr. 1406.)  Ms. Secrest also indicated that she no longer took mental health medications.  (*Id*.)  A week later, Ms. Secrest reported in a medication management appointment that she was better off not taking any medications, and indicated that her mood had been fine with no suicidal ideation.  (Tr. 1404.)  Ms. Secrest was again discharged from Phoenix Rising in October 2021 after not returning phone calls or responding to written communication.  (Tr. 1401-1402.)

## 2. Opinion Evidence

### i. Physical Impairments

#### a. State Agency Medical Consultants

On February 28, 2019, state agency medical consultant Steve McKee, M.D., reviewed Ms. Secrest's medical records and opined that she could—as of twelve months after her alleged

onset date, on October 23, 2019: perform light exertional work; frequently reach overhead with her left upper extremity; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl; and never climb ladders, ropes, or scaffolds.  (Tr. 86-87.)  Dr. McKee further opined that she should avoid all exposure to hazards, such as heavy machinery and unprotected heights.  (Tr. 87.)  On reconsideration on June 26, 2019, state agency medical consultant William Bolz, M.D., affirmed Dr. McKee's RFC findings. (Tr. 107-10.)

On July 26, 2021, state agency medical consultant Leon Hughes, M.D., reviewed Ms. Secrest's updated medical records and opined that she could: perform light exertional work; frequently balance; occasionally climb ramps and stairs, stoop, kneel, crouch, or crawl; and never climb ladders, ropes, or scaffolds.  (Tr. 832-34.)  Dr. Hughes further opined that she should avoid all exposure to hazards, such as commercial driving, unprotected heights, and heavy machinery.  (Tr. 834.)  On reconsideration on November 11, 2021, state agency consultant Gerald Klyop, M.D., affirmed Dr. Hughes's RFC findings.  (Tr. 845-46.)

### ii.    Mental Impairments

### a.    Consultative Examiner

On February 15, 2019, Ms. Secrest presented to Bryan Krabbe, Psy.D., for a consultative psychological examination.  (Tr. 668-674).  Dr. Krabbe reviewed background materials provided by Ohio Division of Disability Determination—including a December 2018 progress note from Jennifer Drake, D.O., addressing insomnia, anxiety, and migraines—and conducted a clinical interview with mental status examination.  (Tr. 668-69, 671-72; *see* Tr. 374-79.)

Ms. Secrest reported a seventh-grade education, after which she obtained a GED.  (Tr. 669.)  She reported off and on employment, with past jobs including work as an STNA and a home health aide; her longest period of employment was four years as a home health aide.  (Tr.

14

670.)  She reported being terminated twice due to caring for her disabled child.  (*Id.*)  She also reported difficulty learning and remembering in prior jobs, but no difficulties staying focused or performing tasks in a timely manner.  (*Id.*)  She did not get along with supervisors or coworkers. (*Id.*)  She endorsed a history of mental health treatment, including psychoactive medications. (*Id.*)  She also described a history of suicide attempt, but denied current suicidal or homicidal ideation, plan, or intent.  (Tr. 671.)  She reported living with her children and being financially supported by her son's disability benefits and child support.  (*Id.*)  She could attend to her daily hygiene, perform household chores, shop for groceries, and prepare basic meals, but was slowed by physical pain and fatigue.  (*Id.*)  She was able to drive but reported no regular social contact outside of her family.  (*Id.*)

A mental status examination revealed: adequate grooming, hygiene, and energy; cooperative behavior; normal speech; adequate receptive language; a sad mood, as displayed by a downcast facial expression; no imminent or acute suicidal thinking; no indication of anger or hostility; and no autonomic or motoric indications of anxiety.  (Tr. 671.)  She was fully oriented, recalled five digits forward and four digits backward, suggesting average immediate memory, recalled two or three words after a brief delay, identified two of the past three presidents, and had no difficulty following the conversation or responding to direct questions.  (Tr. 671-72.)  She was unable to count backward from 100 by sevens in 30 seconds, but could count backward from 20 by threes in 13 seconds, suggesting adequate attention and concentration.  (Tr. 672.)  She had some difficulty calculating division and fractions, and scored in the below average range in abstract reasoning.  (*Id.*)  Her general level of intelligence appeared to fall in the below average range.  (*Id.*)  Her judgment appeared sufficient to make decisions affecting her future and to conduct or own living arrangements efficiently, and she appeared to have adequate insight into

her difficulties.  (*Id.*)  He diagnosed major depressive disorder and unspecified anxiety disorder.

(Tr. 673.)

In a section titled "Functional Assessment," Dr. Krabbe outlined the results of his clinical

interview and mental status findings with respect to Ms. Secrest's functional abilities, as follows:

- As to her ability to understand, carry out, and remember instructions, he noted her mostly adequate performance with measures of memory and remembering instructions, but below average performance on a task to assess difficulty understanding instructions (Tr. 673);

- As to her ability to sustain concentration and persist in work-related activities at a reasonable pace, he noted her mostly adequate performance at sustaining concentration and persisting at a reasonable pace, with some difficulty at serial sevens, but observed that her reported symptoms could result in decreased attention or concentration (Tr. 673-74);

- As to her ability to maintain effective social interaction on a consistent and independent basis with supervisors, co-workers, and the public, he noted her appropriate and pleasant interaction during the evaluation and adequate intellectual functioning to understand and respond to feedback or relate to co-workers, but highlighted her limited work history and lack of regular social contact outside of her family, and observed that her symptoms may lead to instability when presented with critical supervisory feedback or difficulty developing and maintaining appropriate co-worker relationships (Tr. 674);

- As to her ability to deal with normal pressures in a competitive work setting, he noted her appropriate responses and affect during the examination but highlighted her endorsed history of emotional deterioration in response to work pressures and observed that her symptoms may compromise her ability to respond to work pressures (*id.*).

### b.    State Agency Psychological Consultants

On February 25, 2019, state agency psychological consultant Aracelis Rivera, Psy.D.,

reviewed the file and opined that Ms. Secrest could: perform 1-3 step tasks which do not require

extended periods of close attention to detail; perform tasks in environments with only occasional

public, supervisory, and coworker contact; and perform tasks in environments where duties are

relatively static and changes can be explained.  (Tr. 89-92.)  On reconsideration on July 10,

16

2019, state agency psychological consultant Paul Tangeman, Ph.D., affirmed Dr. Rivera's RFC findings. (Tr. 110-113.)

On June 6, 2021, state agency psychological consultant Ellen Rozenfeld, Ph.D., reviewed the updated file and opined that Ms. Secrest could: carry out simple 1-3 step tasks in which duties are routine and predictable, with no demands for fast pace or high production; engage in superficial interaction with coworkers, supervisors, and the general public; and adapt to a setting in which duties are routine and predictable. (Tr. 834-35.) On reconsideration on October 28, 2021, state agency psychological consultant Courtney Zeune, Psy.D., affirmed Dr. Rozenfeld's RFC findings. (Tr. 846-848.)

**C.     Function Reports**

In a December 2018 Function Report, Ms. Secrest reported she was unable to stand or walk more than ten minutes without getting dizzy or nauseated, but denied using an assistive device for ambulation or having difficulty using her hands. (Tr. 223, 228-229.) She complained of horrible headaches, vision problems, and being tired 90% of the day. (Tr. 223.) She said she needed reminders to take care of personal grooming and take her medicine (Tr. 224) but denied any change in her ability to handle money since her impairments began (Tr. 227).

Ms. Secrest reported difficulty getting along with family and friends, but said she got along with authority figures "fine," and denied having ever been fired or laid off from a job because of problems getting along with other people. (Tr. 229.) She said she did not finish tasks she started, had to re-read writing instructions multiple times, and did not follow spoken instructions well. (Tr. 228.) Her mom, sister, and boyfriend helped care for her kids. (Tr. 231.) She did not handle changes in routine or stress well. (Tr. 229.)

For personal care, Ms. Secrest needed breaks in order to get dressed; she could not use hot water in the bath, and could not shower at all because she became dizzy.  (Tr. 224.)  It was hard to shave, care for her hair, feed herself, or use the toilet due to dizziness, difficulty standing, bleeding issues, and GI issues.  (*Id*.)  She did not cook when symptoms were bad but tried to cook a good meal twice a week for her kids; she got tired, dizzy, sick, painful and had brain fog which impeded cooking.  (Tr. 225.)  Dishes and laundry took all day and she needed help for everything; people told her when it was time to clean the house.  (*Id.*)  Ms. Secrest went outside maybe once a week but heat and cold were both intolerable; she also did not go outside because of sadness and lack of interest in anything.  (Tr. 226.)  She only drove on good days and her mom helped her to get around.  (*Id.*)  Ms. Secrest only shopped for necessities and food about once a week; it took about two hours because she needed to rest or stop a lot.  (*Id.*)  She could pay bills and count change, but said she was not able to handle a savings account or checkbook because she didn't have any accounts. (*Id*.)

Ms. Secrest used to like to volunteer and help people, work in the yard, and be outside, but said she now did nothing, went nowhere, and had no friends.  (Tr. 227.)  All abilities listed were impacted by her conditions except for reaching, hearing, seeing, and using hands.  (Tr. 228.)  She could walk about ten steps before resting.  (*Id*.)  Ms. Secrest feared passing out when she was out somewhere and did not hand stress well.  (Tr. 229.)

In a May 2021 Function Report, Ms. Secrest reported that she could not stand or walk longer than 15 minutes, but denied using an assistive device for ambulation.  (Tr. 1085.)  Her hands and feet were swollen from POTS and artery disease, and she could not tolerate cold or heat.  (*Id.*)  Ms. Secrest's feet burned and hurt if she stood or walked more than ten minutes.

(*Id*.) She did housework throughout the day in 10-15 minute increments with rest breaks to lie down and elevate her feet. (Tr. 1086.)

Ms. Secrest did not handle stress well, and changes in routine made her anxious. (Tr. 1087.) Her kids and aunt helped with cleaning, cooking and sometimes bathing. (Tr. 1086.) On bad days, Ms. Secrest needed help with dressing and bathing. (*Id*.) She needed reminders to take her medications, but not to take care of personal needs and grooming. (Tr. 1091.) Ms. Secrest wore a back brace "usually when doing things on [her] feet." (Tr. 1087.)

Her illnesses, injuries, or conditions affected all listed abilities—e.g., lifting, squatting, bending, kneeling, seeing, talking, completing tasks—except for hearing. (Tr. 1089.) She did not finish what she started, and had to keep re-reading written instructions because she forgot them. (*Id*.) She was moody, which caused problems getting along with family and friends. (Tr. 1090.) Ms. Secrest got along with authority figures "ok," and denied having ever been fired or laid off from a job because of problems getting along with other people. (Tr. 1089.) She spent time with others on the phone, but did not do things with other people because she stayed home all of the time. (Tr. 1090.) She watched TV every day and did crafts if she could. (*Id*.)

**D.  Hearing Testimony**

**1.  Plaintiff's Testimony**

**i.  2020 ALJ Hearing**

At the March 17, 2020 ALJ hearing (Tr. 37), Ms. Secrest was represented by counsel and testified that she lived with her 12-year-old daughter and 19-year-old son, who was autistic and received disability benefits (Tr. 43). She had a driver's license, and drove "here and there." (Tr. 43.) Ms. Secrest had not been able to work since October 2018 due to back pain and POTS, which caused multiple symptoms including headaches. (Tr. 45-48.) She did well for a little bit after her emergency back surgery, but was recently advised that she would need to have another

19

lumbar fusion.  (Tr. 46.)  Ms. Secrest had daily pain and numbness in her left side from her hip

down to her feet.  (Tr. 53-54.)  She did not use a cane when walking; instead, she held onto the

wall or leaned on a grocery cart while shopping.  (Tr. 54-55.)  Her neck fusion caused headaches

after sitting too long.  (Tr. 59.)

With regard to her mental health treatment, the medications helped for a while, but they

stopped working even after they were adjusted; Ms. Secrest quit going for treatment and began

trying "the natural stuff."  (Tr. 49-51.)  She had not taken psychiatric medication for five or six

months, but was going to resume treatment because things kept getting worse.  (Tr. 49-50.)  Ms.

Secrest had thoughts of suicide and spent days on the couch in her pajamas.  (Tr. 51-52.)

Her only social contacts were her family members, but she stayed home and did not go

out to eat with them or anything like that.  (Tr. 53.)

ii.    **2023 ALJ Hearing**

At the February 10, 2023 ALJ hearing, Ms. Secrest was represented by counsel and stated

that she lived with her then 15-year-old daughter, but no longer lived with her 21-year-old

autistic son.  (Tr. 802.)  Ms. Secrest testified that she had not worked in the past fifteen years

because she had stayed home with her autistic son, who was chronically ill his whole life.  (Tr.

804.)  Her back had gotten horribly worse since her last surgery, and she could not walk well—

she wobbled and had horrible pain in her hip, legs, hand and feet "nothing like you could ever

imagine."  (*Id*.)  Those symptoms made Ms. Secrest wish she was dead at times, but she did not

want to kill herself.  (Tr. 805.)  She acknowledged that she had not had further treatment for her

back since July 2020, and said the neurosurgeon did not take her insurance.  (Tr. 805-07.)

Ms. Secrest still experienced headaches, but not to the extent that she had in the past.

(Tr. 807-809.)  Her new glasses "maybe" helped improve her headaches.  (Tr. 807.)  Ms. Secrest

20

denied any treatment for her headaches in the past year, and took only over-the-counter

medication, which "[did] kind of help here and there."  (Tr. 807-809.)  She got both "regular,

generic" headaches which was "a little pressure or something" as well as the type that feels like

someone was stabbing her in the head, and she could not take noise or smells.  (Tr. 808.)

Since the last hearing, she had fallen a lot, had a hard time slipping into pants, and

dropped things because she could not feel them.  (Tr. 811-812.)  Lifting was more difficult due to

the numbness in her fingers.  (Tr. 813.)   Regarding her mental health, her bipolar disorder and

depression made her want to hide and give up, but she denied any mental health treatment in the

prior year.  (Tr. 806-807.)  Depression caused her to not want to do anything.  (Tr. 812.)

### 2.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the 2023 hearing.  (Tr. 817.)  The VE testified

that a hypothetical individual of Ms. Secrest's age, education and work experience and with the

functional limitations described in the ALJ's RFC determination (Tr. 773) could perform

representative positions in the national economy, including addresser, document preparer, tube

operator or circuit board assembly screener.  (Tr. 822-23.)   The VE specified that these jobs

allowed for the restriction to avoiding concentrated exposure to loud noises or lighting brighter

than typically in an office.  (Tr. 823-24.)

The VE testified that employers generally allow for four 15- minute breaks (two in the

first half of the shift and two in the second half) and a 30-minute meal break.  (Tr. 824.)  She also

testified that employers generally would not tolerate an individual being off task 14% or more of

the time.  (*Id*.)  The VE also testified that an employer would generally not tolerate an individual

missing one day per month during the ninety-day probationary period and no more than one and

a half days a month thereafter.  (Tr. 824-25.)

21

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).  Under this

sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters*

*v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the Residual Functional

Capacity ("RFC") and vocational factors to perform other work available in the national

economy.  *Id.*

## IV.    The ALJ's Decision

In her March 20, 2023 decision, the ALJ made the following findings:[3]

1.    The claimant has not engaged in substantial gainful activity since October
      23, 2018, the application date.  (Tr. 770.)

2.    The claimant has the following severe impairments: degenerative joint
      disease of the left shoulder, obesity, hypertension, degenerative disc disease
      of the lumbar spine with stenosis and disc herniation causing cauda equine
      syndrome status post emergent discectomy and decompression surgery in
      December 2018 with subsequent repeat lumbar surgery, positional
      orthostatic tachycardia syndrome, headaches, tics, anxiety disorder, major
      depressive disorder, and bipolar disorder.  (*Id.*)

3.    The claimant does not have an impairment or combination of impairments
      that meets or medically equals the severity of the listed impairments in 20
      C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 771.)

4.    The claimant has the residual functional capacity to perform sedentary work
      as defined in 20 CFR 416.967(a) except she can occasionally climb ramps
      and stairs and never climb ladders, ropes and scaffolds. She can
      occasionally balance, stoop, kneel, crouch and crawl.  She can frequently
      reach overhead with the left upper extremity. She can frequently handle and
      finger with the bilateral upper extremities. She should avoid exposure to
      dangerous moving machinery and unprotected heights and shoulder
      perform no commercial driving. She should avoid concentrated exposure to
      loud noise and lighting brighter than that found in a typical office
      environment. She can perform simple tasks in an environment free of fast-
      paced production requirements or strict production quotas and with
      infrequent changes in jobs duties with changes explained in advance. She
      can have occasional interaction with others. She should not be required to

---

[3] The ALJ's findings are summarized.

perform work tasks that involve confrontation, conflict resolution, directing the work of others, persuading or influencing others, or being responsible for the safety or welfare of others. She should avoid concentrated exposure to extreme cold. (Tr. 773.)

5.    The claimant has no past relevant work. (Tr. 780.)

6.    The claimant was born in 1973 and was 45 years old, defined as a younger individual age 18-49, on the date the application was filed. (*Id.*)

7.    The claimant has at least a high school education. (*Id.*)

8.    Transferability of job skills is not material to the determination of disability. (*Id.*)

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including addresser, document preparer, and tube operator. (Tr. 781.)

Based on the foregoing, the ALJ determined that Secrest had not been under a disability, as defined in the Social Security Act, since October 23, 2018, the date the application was filed. (Tr. 781.)

## V.      Plaintiff's Arguments

Ms. Secrest presents four assignments of error. First, she argues that the ALJ erred in evaluating the opinions of the consultative examiner and state agency psychological consultants. (ECF Doc. 8, p. 1.) Second, she argues that ALJ erred by not properly evaluating migraine headaches at Step Three of the sequential analysis. (*Id.*) Third, Ms. Secrest contends that the ALJ erred at Step Three by failing to find that she met or equaled Listing 1.16. (*Id.*) Fourth, Ms. Secrest avers that the ALJ failed to comply with the Appeals Council's Remand Order. (*Id.*)

24

# VI.    Law & Analysis

## A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the

Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.     First Assignment of Error: Whether ALJ Properly Evaluated Persuasiveness of the Opinions of the Consultative Examiner and State Agency Consultants**

Ms. Secrest challenges the ALJ's persuasiveness analysis for the medical opinions of psychological consultative examiner Dr. Krabbe (ECF Doc. 8, pp. 10-12), and state agency psychological consultants Drs. Rivera and Tangeman (*Id.* at pp. 12-13).  As to Dr. Krabbe, Ms. Secrest contends that: the ALJ mischaracterized the opinion when she said Dr. Krabbe "reviewed the file"; the ALJ provided a "confusing" persuasiveness analysis when she referred to the opinion as both "persuasive" and "not persuasive"; and her persuasiveness finding was not supported by substantial evidence.  (*Id.* at pp. 10-12.)  As to Drs. Rivera and Tangeman, Ms. Secrest asserts that the ALJ's assessment of those 2019 opinions as "partially persuasive" lacked the support of substantial evidence because the ALJ "adopted" the 2021 opinions of state agency psychological consultants Drs. Rozenfeld and Zeune—in which "[t]he limitations were the same"—without explaining the inconsistency in her findings.  (*Id.* at 12-13.)

26

The Commissioner counters that substantial evidence supports the ALJ's evaluation of the contested opinion evidence.  (ECF Doc. 10, p. 14.)  Specifically, the Commissioner asserts that: the ALJ adequately addressed supportability and consistency; any error in her evaluation of Dr. Krabbe was typographical and harmless; and Ms. Secrest's premise in challenging the 2019 state agency psychological consultant opinions—namely that the 2019 opinions' limitations were the same as the adopted 2021 limitations—is incorrect.  (*Id.* at pp. 14-18.)

### 1.    Legal Framework for Evaluation of Medical Opinion Evidence

The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 416.920c(a); *see Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020).  The five factors to be considered are supportability, consistency, relationship with the claimant, specialization, and other factors.  20 C.F.R. § 416.920c(c)(1)-(5).  The most important factors are supportability and consistency.  20 C.F.R. §§ 416.920c(a), 416.920c(b)(2).  ALJs must explain how they considered consistency and supportability, but need not explain how they considered the other factors.  20 C.F.R. § 416.920c(b)(2).

As to supportability, the regulations state: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 416.920c(c)(1).  In other words, "supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in the opinion.

As to consistency, the regulations state: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 416.920c(c)(2).  In other words, "consistency" is the extent to which a medical source's opinion findings are consistent with evidence from other medical and nonmedical sources in the record.

The undersigned turns to whether the ALJ's evaluation of the challenged medical opinions satisfied the regulatory framework for evaluation of medical opinion evidence.

### 2.      Whether ALJ Properly Evaluated Opinion of Consulting Examiner

The ALJ evaluated the persuasiveness of Dr. Krabbe's opinion as follows:

On February 19, 2019, State Agency consultant Bryan J. Krabbe, Psy.D., <u>reviewed the claimant's medical record</u> and stated that the claimant performed adequately on tasks to assess short-term memory. He noted that she reported difficulties learning in school, learning work-related tasks, and acquiring ne[w] information. She had difficulty with completing serials sevens, but not serial threes. She was noted to have some difficulty with attention and focus. He noted the claimant reported past issues responding to supervisors and relating with coworkers. He noted that she might have difficulty with emotional stability when dealing with critical supervisory feedback and maintaining appropriate coworker relationships. He noted that she has difficulty with responding to work pressures leading to increased emotional instability and withdrawal[].  <u>The opinion of Dr. Krabbe is persuasive because it was not internally consistent with his own findings and therefore is opinion is not supported. Further, his opinion is not consistent with the record as a whole. With regard to supportability, the opinion of Dr. Krabbe was noted to be based generally on the claimant's subjective allegations. Indeed, he often recounted her allegations. However, his own findings showed much less significant findings related to cognitive functioning, attention and concentration, and memory. He also did not note depressed mood, but simply noted that she reported depressed mood and anxiety []. Therefore, his opinion is not persuasive due to significant issues with supportability and consistency with the record.</u>

(Tr. 779 (internal citations omitted) (emphasis added).)

Ms. Secrest argues first that the ALJ erred when she incorrectly stated that "Dr. Bryan Krabbe was a State Agency Consultant who reviewed the file" when he in fact "examined

Plaintiff at the requests of the State Agency on February 19, 2019."  (ECF Doc. 8, p. 10.)  While

Ms. Secrest does not elaborate on what harm the alleged error caused, the undersigned finds the

argument meritless on its face because there was no mischaracterization.  The ALJ said Dr.

Krabbe "reviewed the claimant's medical record" (Tr. 779), which is consistent with Dr.

Krabbe's report that he reviewed background materials that included a medical progress note

from Dr. Drake (Tr. 668-69).  The ALJ then referenced findings from Dr. Krabbe's clinical

interview and mental status examination of Ms. Secrest.  (Tr. 779 (citing Tr. 668-74).)  Thus,

Ms. Secrest's argument that the ALJ incorrectly characterized Dr. Krabbe as a state agency

psychological consultant, rather than a consultative psychological examiner, is not well taken.

Ms. Secrest next asserts that the ALJ's "inconsistency regarding persuasiveness is

confusing at best" because the ALJ described Dr. Krabbe's opinion as both "persuasive" and

"not persuasive."  (ECF Doc. 8, p. 10.)  The relevant language is as follows:

> The opinion of Dr. Krabbe is <u>persuasive</u> because it was not internally consistent
> with his own findings and therefore is opinion is not supported. Further, his opinion
> is not consistent with the record as a whole. . . . Therefore, his opinion is <u>not</u>
> <u>persuasive</u> due to significant issues with supportability and consistency with the
> record.

(Tr. 779 (emphasis added).)  The Commissioner responds: "While the ALJ's decision has a

typographical error in that it states that Dr. Krabbe's opinion was 'persuasive,' when reading her

analysis as a whole, it is apparent that the ALJ found the opinion was not persuasive."  (ECF

Doc. 10, pp. 14-15 (citing Tr. 779).)  The undersigned agrees that it is clear, in context, that the

ALJ intended to find the opinion *not* persuasive.  The ALJ said that she found the opinion

*persuasive* "because it was <u>not</u> internally consistent . . . and . . . <u>not</u> supported," and "[f]urther"

was "<u>not</u> consistent with the record as a whole," and then concluded based on specified findings

in the report that the opinion was "[t]herefore . . . <u>not</u> persuasive due to significant issues with

supportability and consistency with the record."  (Tr. 779 (emphasis added).)  Thus, her analysis

as a whole clearly reflected an intent to find the opinion *not* persuasive, and her "initial contradictory statement that [the] opinion was 'persuasive' was a harmless scrivener's error." *Draine v. Comm'r of Soc. Sec.*, No. 1:22-CV-1370, 2024 WL 1014030, at *24 (N.D. Ohio Mar. 8, 2024) (finding harmless error when an initial statement that an opinion was "persuasive" was clearly a typographical error); *see also Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) (finding harmless error analysis applies in the social security disability context).

Ms. Secrest argues finally that "Dr. Krabbe's opinion was consistent with the treatment records from Phoenix Rising," and describes various findings from the medical records in support of this assertion.  (ECF Doc. 8, p. 11.)  Because "[t]he psychological records in this matter were consistent with each other," she argues the ALJ's finding that Dr. Krabbe's opinion was not persuasive "was not supported by substantial evidence."  (*Id.* at pp. 11-12.)  To the extent Ms. Secrest is arguing that the ALJ erred because there is medical evidence that is consistent with Dr. Krabbe's opinion, she misapprehends the applicable legal standard.  Even if a preponderance of the evidence supports a finding that the opinion was persuasive, this Court cannot overturn the ALJ's finding to the contrary "so long as substantial evidence also support[ed] the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477; *Blakley*, 581 F.3d at 406.  Thus, the only question before this Court is whether there was substantial evidence in the record to support the ALJ's finding that Dr. Krabbe's opinion was not persuasive.

Here, the ALJ explained that she found Dr. Krabbe's opinion not persuasive for multiple reasons.  In particular, she found the opinion: appeared to be based "generally on the claimant's subjective allegations," like where Dr. Krabbe "did not note depressed mood, but simply noted that [Ms. Secrest] reported depressed mood and anxiety"; was not internally consistent with Dr. Krabbe's own objective findings, which "showed much less significant findings related to

cognitive functioning, attention and concentration, and memory"; and was "not consistent with the record as a whole." (Tr. 779.)

Before finding Dr. Krabbe's opinion was not consistent with the record as a whole, the ALJ had already noted that Ms. Secrest's mental health treatment records "showed no remarkable departure [from the consultative examination] with regard to mental status examination findings" in early 2019, when Ms. Secrest's "[m]edications remained consistent," after which there was "a break in mental health treatment between June 2019 and September 24, 2020," followed by some additional treatment through February 2021. (Tr. 776-77.) After analyzing the persuasiveness of all of the opinion evidence, the ALJ went on to observe:

> [T]he claimant's mental status examination findings which were often unremarkable [], but which at times also had more significant findings of depressed mood, rapid speech, paranoid thoughts, and some vague visual hallucinations [] supported the [RFC] limitations in task complexity, stress tolerance, and social interaction.

(Tr. 780 (internal citations omitted).)

Although Ms. Secrest argues generally that Dr. Krabbe's opinion was consistent with other medical records (ECF Doc. 8, pp. 11-12), she does not identify evidence that the ALJ failed to consider in reaching a conclusion to the contrary, and does not provide a developed argument as to why the ALJ's persuasiveness finding lacked the support of substantial evidence. In the absence of a clear explanation as to how the ALJ's analysis was deficient, the undersigned finds Ms. Secrest has not met her burden to show that the ALJ's persuasiveness analysis lacked the support of substantial evidence. *See Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 490–91 (6th Cir. 2006) (declining to perform an "open-ended review" of the record in the face of underdeveloped argument, instead "limit[ing] consideration to the particular points" raised).

For the reasons stated above, the undersigned finds Ms. Secrest has not met her burden to show that the ALJ did not consider the entire record when evaluating Dr. Krabbe's opinion,

failed to adequately articulate her reasons for finding the opinion not persuasive, or lacked the support of substantial evidence for her persuasiveness finding.

### 3. Whether ALJ Properly Evaluated Opinion of 2019 State Agency Psychological Consultants

The ALJ evaluated the persuasiveness of the opinions of state agency psychological consultants Drs. Rivera and Tangeman, in pertinent part, as follows:

> On February 25, 2019, State Agency consultant Aracelis Rivera, Pys.D., reviewed the claimant's medical record and opined that . . . <u>the claimant was limited to performing one to three step tasks which do not require extended periods of close attention to detail</u>. He said the claimant was limited to performing tasks in environments with only occasional public, supervisory, and coworker contact. Finally, he said the claimant was limited to performing tasks in environments where duties were relatively static, and changes could be explained []. On July 10, 2019, <u>State Agency consultant Paul Tangeman, Ph.D. agreed with the earlier opinion of Dr. Rivera</u> []. <u>The opinions of the State Agency consultants as part of the prior Administrative findings are only somewhat persuasive</u>. The State Agency consultants supported their assessment of the claimant's impairments with references to the record which included her allegations, mental status examination findings, and use of psychotropic medication. <u>While they supported their opinion with references to the record, their use of one-to-three step tasks which do not require extended periods of close attention to detail, as a limitation was on the one hand more rigid with regard to the number of tasks, than was supported by the record, but also too vague with regard to extended periods of close attention to detail. As such, their opinion did not provide a clear vocationally relevant limitation when compared to the record as a whole</u>. . . . Finally, their opinion was not consistent with the record which showed many findings of average eye contact, euthymic mood, and full affect, as well as minimal limitations regarding thought process, insight and judgment []. While the record shows brief periods with more significant findings, these findings accounted for a time period of[] less than six months [].

(Tr. 777-78 (internal citations omitted) (emphasis added).)

Ms. Secrest argues that the ALJ's evaluation of the limitation to "performing one to three step tasks which do not require extended periods of close attention to detail" is inconsistent with her evaluation of the corresponding limitations set forth in the 2021 state agency psychological

consultants' opinions.[4]  (ECF Doc. 8, p. 12.)  The entirety of her argument on this point is that "[t]he limitations were the same, the ALJ erroneously found that one set of findings were partially persuasive and the other findings were adopted," and that "[t]his inconsistency was not explained."  (*Id.* at 13.)  Accordingly, the undersigned will examine whether the ALJ erred in putting forth an inconsistent evaluation of two sets of identical limitations, with the limitations from 2021 being adopted while the limitations from 2019 were rejected.

Upon review of the record, the undersigned finds Ms. Secrest's argument lacks merit as it relies on an inaccurate description of the ALJ's findings.  As the Commissioner correctly points out, the limitations at issue in the 2019 and 2021 state agency mental RFC opinions were different, and the ALJ expressly discussed this fact.  (Tr. 777-79; *see also* ECF Doc. 10, p. 17.)

The ALJ's evaluation of the opinions by Drs. Rozenfeld and Zuene, the state agency psychological consultants who reviewed the medical record in 2021, is set forth below:

> As part of a subsequent claim[] filed on March 31, 2021, State Agency consultant Ellen Rozenfeld, opined on June 6, 2021, that . . . the claimant was limited to carrying out simple one to three step tasks in which duties are routine and predictable, with no demands for fast pace or high production. . . . On October 28, 2021, State Agency consultant Courtney Zuene, Psy.D., reviewed the updated record and agreed with the earlier findings []. The State Agency consultants supported their opinion with references to the claimant's treatment records, which reflected the updated medical record. While they supported their opinion with references to the record, their use of one-to-three step tasks was again too specific a restriction that was not supported by the treatment records. Otherwise, their limitations regarding the type of duties and the limitation with regard to demand were more consistent with the treatment records. Their opinion was more consistent with the claimant's treatment records . . . . As such, the findings present throughout much of the record support the remaining limitations of the State Agency consultants.

---

[4] To the extent Ms. Secrest intended to argue that the ALJ erred *in the 2020 ALJ decision* because certain limitations from the 2019 state agency psychological consultants were not adopted *in the 2020 RFC* (*see* ECF Doc. 8, p. 12), the undersigned will not address because the issue does not relate to the 2023 ALJ opinion and is therefore moot.

(Tr. 778-79 (citations omitted) (emphasis added).)  Prior to this analysis, the ALJ had already addressed the 2021 opinions in her discussion of the 2019 opinions, explaining that "the opinion of the State Agency as part of the subsequent application provided a clearer assessment of the claimant's impairments, especially in light of the expanded medical record."  (Tr. 777.)

With respect to the limitations addressed in Ms. Secrest's appeal, it is evident that the ALJ broke the relevant limitations into sub-parts which were addressed separately.  For the 2019 opinions of Drs. Rivera and Tangeman, the sub-parts are: (1) one to three step tasks; (2) which do not require extended periods of close attention to detail.  (Tr. 777.)  For the 2021 opinions of Drs. Rozenfeld and Zuene, the sub-parts are: (1) simple one to three step tasks; (2) in which duties are routine and predictable, with no demands for fast pace or high production.  (Tr. 779.)

Clearly, it is the first sub-part of the opinions that is the most similar.  Consistent with that fact, the ALJ explained that she found the limitation to "one three step tasks" to be "more rigid with respect to the number of tasks[] than was supported by the record" in discussing the 2019 opinions (Tr. 777) and "again too specific a restriction that was not supported by the treatment records" in discussing the 2021 opinions (Tr. 779).  That is, she did not adopt this part of the opined limitations from any of the state agency psychological consultants, and articulated similar reasoning to support the decision in her analysis of both the 2019 and the 2021 opinions.

As to the second sub-parts, where the proposed limitations in the 2019 and 2021 opinions are clearly distinct, the ALJ's analysis is likewise distinct.  As to the 2019-specific limitation to tasks that do not require "extended periods of close attention to detail," the ALJ found the limitation "too vague" and therefore lacking "a clear vocationally relevant limitation when compared to the record as a whole."  (Tr. 777.)  On the other hand, the ALJ found the 2021-specific limitation to "tasks in which duties are routine and predictable, with no demands for face

34

pace or high production," to be "more consistent with the treatment records" (Tr. 779) and

adopted similar limitations in the RFC (Tr. 773).  Thus, the ALJ clearly explained her reasons for

assigning different persuasiveness findings to the 2019 and 2021 opinions.  Ms. Secrest's

argument that "[t]he limitations were the same, but the ALJ erroneously found that one set of

findings were partially persuasive and the other findings were adopted" lacks merit.

For the reasons stated above, the undersigned finds Ms. Secrest has not met her burden to

show that the ALJ failed to adequately articulate her reasons for finding the opinions of Drs.

Rivera and Tangeman "somewhat persuasive" or lacked the support of substantial evidence for

her persuasiveness finding.  Accordingly, the undersigned concludes that Ms. Secrest's first

assignment of error is without merit.

**C.     Second Assignment of Error: Whether ALJ Erred by Not Considering Headaches Under Listing 11.02 at Step Three**

In her second assignment of error, Ms. Secrest argues that the ALJ erred at Step Three of

the sequential analysis when she failed to consider Ms. Secrest's headaches under Listing 11.02,

pursuant to Social Security Ruling ("SSR") 19-4.[5]  (ECF Doc. 8, pp. 13-16.)  The Commissioner

responds that the ALJ was not required to address Listing 11.02 because the record did not raise

a substantial question as to whether Ms. Secrest could qualify as disabled under Listing 11.02.

(ECF Doc. 10, pp. 18-19.)

**1.     Legal Standard for Step Three Evaluation**

At Step Three of the disability evaluation process, a claimant will be found disabled if her

impairment meets or equals one of the listings in the Listing of Impairments. *See* 20 C.F.R. §

---

[5] To the extent Ms. Secrest also intends to challenge the ALJ's consideration of her headaches at other steps of the sequential analysis, the argument is not adequately developed and is deemed waived. *See Hollon*, 447 F.3d at 491; *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").  To the extent Ms. Secrest is challenging the ALJ's compliance with the Remand Order, such arguments are addressed in section VI.E.2., *infra*.

404.1520(a)(4)(iii).  Under this sequential analysis, the claimant retains the burden of proof at Step Three.  *See Walters*, 127 F.3d at 529.  To prove disability, a claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency."  *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004).

"[N]either the listings nor the Sixth Circuit require the ALJ to 'address every listing' or 'to discuss listings that the applicant clearly does not meet.'"  *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) (quoting *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 641 (6th Cir. 2013)).  An "ALJ should discuss the relevant listing, however, where the record raises 'a substantial question as to whether [the claimant] could qualify as disabled' under a listing."  *Smith-Johnson*, 579 F. App'x at 432 (citing *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)).  To raise a "substantial question," the Court explained, "[a] claimant must do more than point to evidence on which the ALJ could have based his finding."  *Id.* (citing *Sheeks*, 544 F. App'x at 641-42).  "[T]he claimant must point to specific evidence that demonstrates [s]he reasonably could meet or equal every requirement of the listing."  *Id.*

### 2.  Whether ALJ Properly Considered Headaches at Step Three

Both Ms. Secrest and the Commissioner acknowledge that the ALJ did not address headaches or Listing 11.02 at Step Three of the sequential analysis.  (Tr. 771; *see* ECF Doc. 8, p. 14; ECF Doc. 10, p. 18-19.)  Ms. Secrest contends that the ALJ was required to consider her headaches at Step Three, while the Commissioner argues that she was not.  (*Id.*)

While headaches are not a listed impairment, SSR 19-4p provides guidance on how "primary headache disorders" can be evaluated in determining whether the impairment medically equals Listing 11.02.  *See* SSR 19-4p, 84 Fed. Reg. 44667, 44667-71 (Aug. 26, 2019).  Primary

headache disorders are "a collection of chronic headache illnesses characterized by repeated exacerbations of overactivity or dysfunction of pain-sensitive structures in the head," such as "migraines, tension-type headaches, and trigeminal autonomic cephalalgias."  SSR 19-4p, 84 Fed. Reg. 44667, 44669.  SSR 19-4p advises that the Commissioner "may find that a primary headache disorder, alone or in combination with another impairment(s), medically equals a listing," and instructs that Listing 11.02—specifically, paragraph B or D for dyscognitive seizures—is the "most closely analogous listed impairment" for a primary headache disorder. *Id.* at 44670-71.  Ms. Secrest asserts that paragraph B applies to her case.  (ECF Doc. 8, p. 15.)

Listing 11.02B involves "Dyscognitive seizures [], occurring at least once a week for at least 3 consecutive months [] despite adherence to prescribed treatment []."  20 C.F.R. Part 404, Subpart P, App.1, § 11.02B (internal citations omitted).  "Despite adherence to prescribed treatment" means that a claimant has "taken medication(s) or followed other treatment procedures for [her] neurological disorder(s) as prescribed by a physician for three consecutive months but [her] impairment continues to meet the other listing requirements despite this treatment."  20 C.F.R. Part 404, Subpart P, App.1, § 11.00C.  To determine whether a claimant's headaches medically equal Listing 11.02B, the ALJ is to consider:

> [a] detailed description from an [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

SSR 19-4p, 84 Fed. Reg. 44667, 44670.

In support of her argument that the ALJ erred in failing to address her headaches under Listing 11.02 at Step Three, Ms. Secrest points to the following evidence:

- A December 2018 psychiatric diagnostic evaluation where she reported a history of headaches among other physical symptoms (Tr. 1348, 1352);

- A December 2018 neurology office visit, where she sought treatment of her migraines, after last being seen three years prior, and was started on prescription medications and told to reduce her Tylenol use (Tr. 374, 377-78);

- Hearing testimony in March 2020 that her POTS and spinal impairments caused headaches (Tr. 45, 48, 59);

- A July 2020 hospitalization for spinal surgery where she reported an allergy to Norco, indicating that the medication causes a "horrible headache" (Tr. 1177); and

- Hearing testimony in February 2023 that she still had headaches, but they were improved, she had not received treatment for headaches since her back surgery in July 2020, and she treated them with over-the-counter medications only (Tr. 807-09).

(ECF Doc. 8, p. 14.)  The Commissioner argues in response that the ALJ considered Ms. Secrest's headache allegations and treatment regimen, including "her lack of treatment at times," and appropriately found her headaches were not work preclusive.  (ECF Doc. 10, p. 19 (citing Tr. 774, 779-80 (citing Tr. 223-30, 266, 322-23, 374, 376-77)).)

The undersigned finds Ms. Secrest has not met her burden to "point to specific evidence that demonstrates [s]he reasonably could meet or equal every requirement of the listing." *Smith-Johnson*, 579 F. App'x at 432.  Listing 11.02B requires not only that seizures occur once per week for three months, but also that such frequency persist "despite adherence to prescribed treatment."  20 C.F.R. Part 404, Subpart P, App.1, §§ 11.00C, 11.02B.  Applying that requirement here, Ms. Secrest would need to show that her headaches persisted at Listings-level frequency despite her "tak[ing] medication(s) or follow[ing] other treatment procedures for [her] neurological disorder(s) as prescribed by a physician for three consecutive months. . . ."  20 C.F.R. Part 404, Subpart P, App.1, §§ 11.00C, 11.02B.  A single neurological treatment visit to

38

reestablish care after a three-year absence, with no apparent follow-up, does not meet this standard.  (Tr. 374-79.)  The reported improvement of her headaches despite treatment limited to over-the-counter medications further undermines the application of Listing 11.02.[6]  (Tr. 807-09.) Thus, Ms. Secrest has not met her burden to demonstrate that the evidence in the record presents a "substantial question" as to whether she could qualify as disabled under Listing 11.02 based on her severe headache impairment.  *See Smith-Johnson*, 579 F. App'x at 432.

It is additionally noted that Ms. Secrest was represented by counsel at both of the underlying disability hearings, and did not argue for the application of Listing 11.02 at either proceeding.  (Tr. 41-42, 798-99.)  "Where the claimant does not mention the particular Listing at the hearing before the ALJ, the Sixth Circuit has found that the ALJ is not obligated to discuss that particular Listing."  *McGeever v. Comm'r of Soc. Sec.*, No. 1:18CV0477, 2019 WL 1428208, at *7 (N.D. Ohio Mar. 29, 2019) (citing *Wilson v. Commissioner*, No. 14-5968, 2015 WL 4385281, at *4 (6th Cir. July 16, 2015) (per curiam) and *Malone v. Commissioner*, No. 12-3028, 2012 WL 5974463, at *2 (6th Cir. Nov. 29, 2012) (per curiam)).

For the reasons set forth above, the undersigned finds Ms. Secrest has not met her burden to demonstrate that the ALJ erred when she failed to discuss whether Ms. Secrest's headaches equaled Listing 11.02B under SSR 19-4p.  Accordingly, the undersigned concludes that Ms. Secrest's second assignment of error is without merit.

---

[6] Ms. Secrest's testimony that her headaches were caused by POTS and/or her spinal impairment (Tr. 45, 48, 59) also undermine the application of Listing 11.02, since they raise a question as to whether those headaches resulted from a "primary headache disorder."  *See* SSR 19-4p, 84 Fed. Reg. 44667, 44669 (finding the Commissioner may "*not* establish secondary headaches (for example, headache[s] attributed to trauma or injury to the head or neck or to infection) as MDIs because secondary headaches are symptoms of another underlying medical condition").

**D.     Third Assignment of Error: Whether ALJ Erred by Failing to Find Plaintiff Met Listing 1.16 at Step Three**

In her third assignment of error, Ms. Secrest argues "[b]ased on the evidence in the record, the ALJ's conclusion that Plaintiff did not satisfy the criteria of Listing 1.16 was not supported by substantial evidence and was in error," and alternately that she medically equaled Listing 1.16 even if she did not meet the Listing criteria.  (ECF Doc. 8, pp. 19-20.)  The Commissioner counters that Ms. Secrest does not meet the listing requirements, and that her argument regarding medically equaling the listing amounts to no more than a reweighing of evidence.  (ECF Doc. 10, pp. 20-23.)  Thus, the Commissioner avers that substantial evidence supports the ALJ's finding regarding Listing 1.16.  (*Id.*)

**1.     Legal Standard for Evaluating Listing 1.16**

As discussed in section VI.C.3, *supra*, Ms. Secrest may be found disabled at Step Three if her impairment meets or equals a Listing.  *See* 20 C.F.R. § 404.1520(a)(4)(iii).  She retains the burden of proof at Step Three, *see Walters*, 127 F.3d at 529, and "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency," *Thacker*, 93 F. App'x at 728.  Listing 1.16 requires a claimant to establish the following:

**1.16 Lumbar spinal stenosis resulting in compromise of the cauda equina (see 1.00G), documented by A, B, C, and D:**

A. Symptom(s) of neurological compromise manifested as:
1. Nonradicular distribution of pain in one or both lower extremities; or
2. Nonradicular distribution of sensory loss in one or both lower extremities; or
3. Neurogenic claudication.

AND

B. Nonradicular neurological signs present during physical examination (see 1.00C2) or on a diagnostic test (see 1.00C3) and evidenced by 1 and either 2 or 3:

1. Muscle weakness.

2. Sensory changes evidenced by:

a. Decreased sensation; or

b. Sensory nerve deficit (abnormal sensory nerve latency) on electrodiagnostic testing; or

c. Areflexia, trophic ulceration, or bladder or bowel incontinence.

3. Decreased deep tendon reflexes in one or both lower extremities.

AND

C. Findings on imaging (see 1.00C3) or in an operative report (see 1.00C4) consistent with compromise of the cauda equina with lumbar spinal stenosis.

AND

D. Impairment-related physical limitation of musculoskeletal functioning that has lasted, or is expected to last, for a continuous period of at least 12 months, and medical documentation of at least one of the following:

1. A documented medical need (see 1.00C6a) for a walker, bilateral canes, or bilateral crutches (see 1.00C6d) or a wheeled and seated mobility device involving the use of both hands (see 1.00C6e(i)); or

2. An inability to use one upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements (see 1.00E4), and a documented medical need (see 1.00C6a) for a one-handed, hand-held assistive device (see 1.00C6d) that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand (see 1.00C6e(ii)).

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.16.

### 2.      Whether ALJ Erred in Finding Plaintiff Did Not Meet or Equal Listing 1.16

The ALJ addressed Listing 1.16 as follows:

The claimant does not meet listings 1.15 or 1.16. The record shows that the claimant has a history of surgery to the spine prior to the protected filing date. During the relevant period, the claimant underwent imaging studies which showed degenerative changes with compromise of the cauda equina nerve roots, which led to a revision decompression and discectomy in December 2018, and a second surgery in July 2020 []. While the claimant experienced significant findings prior to her surgeries, such as in July 2020, where she presented with significantly decreased motor strength in the right lower extremity including the great toe, with

41

inability to straight leg raise, inability to pick her heel off the car, and decreased sensation in the right lower extremity [], these findings presented shortly before surgery and were not present immediately following the procedures []. <u>The claimant did not meet listing 1.15 or 1.16, because although the claimant reported the use of a walker and inability to ambulate prior to surgery [], the record does not indicate a documented need for a walker, bilateral canes, or bilateral crutches, or a wheeled and seated mobility device involving the use of both hands. Further, while she presented with mild degenerative changes to the left shoulder [], the record did not indicate a medical need for a single cane, and an inability to use the left upper extremity.</u> Therefore, part D of both listings are not met.

(Tr. 771 (internal citations omitted) (emphasis added).)  Thus, of the four required categories to meet Listing 1.16 as set forth in paragraphs A, B, C and D, the ALJ based her decision squarely on paragraph D.

Ms. Secrest paraphrases the text of Listing 1.16 but limits her summary to paragraphs A, B and C; she does not acknowledge the additional mandatory requirements of paragraph D. (ECF Doc. 8, p. 17.)  She then acknowledges that the ALJ's decision turned on the claimant "not hav[ing] a documented need for a walker etc. or difficulty using both hands," but her only argument in response is that "Plaintiff, however, had documented problems with her hands."  (*Id.* at p. 18 (citing Tr. 771).)  As the Commissioner points out, "the listing does not require merely 'problems with her hands.'"  (ECF Doc. 10, p. 21.)

Paragraph D requires either (1) a "documented medical need" for an assistive device that requires the use of both hands (like a walker, bilateral canes, bilateral crutches, or a wheeled and seated mobility device) or (2) an inability to use one upper extremity to perform work activities involving fine and gross movements <u>and</u> a "documented medical need" for an assistive device that requires the use of the other upper extremity (like a one-handed, hand-held assistive device or a seated mobility device involving the use of one hand).  20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.16D.  In addressing the first requirement, the ALJ found "the record does not indicate a documented need for a walker, bilateral canes, or bilateral crutches, or a wheeled and seated

42

mobility device involving the use of both hands."  (Tr. 771.)  In addressing the second

requirement, the ALJ found "the record did not indicate a medical need for a single cane, and an

inability to use the left upper extremity."  (*Id.*)

In support of her argument that the ALJ erred in her assessment of Ms. Secrest's ability

to use her feet and hands under Listing 1.16, Ms. Secrest points to the following evidence:

- A January 2020 report to her cardiologist that she suffered occasional peripheral edema that was relieved by rest and elevation (Tr. 1386);

- An October 2020 complaint to her primary care provider in a telehealth appointment of pain, redness, and swelling in her feet and hands, starting five months prior, with a note that her spinal surgeon said this had nothing to do with her surgery and an assessment of Raynaud's phenomenon without gangrene (Tr. 1156-57);

- A June 2021 complaint to her cardiologist of pain and swelling to her fingers and toes with a history of smoking, with a note to rule out peripheral arterial disease and a normal physical examination with extremities revealing no edema (Tr. 1392-93);

- A September 2021 complaint to her cardiologist of burning pain to the upper and lower extremities, with a continued note to rule out peripheral arterial disease, and her extremities continuing to reveal no edema on examination (Tr. 1412-13); and

- Hearing testimony in February 2023 that she did not walk well since her June 2020 spinal surgery, "wobble[d]," had pain in her hip, legs, hands, and feet that felt like fire or being frostbitten, wore gloves even to touch silverware, wore socks except to shower, and could hardly feel her right leg anymore (Tr. 804-05).

(ECF Doc. 8, pp. 18-19.)  None of this evidence demonstrates a "documented medical need" for

an assistive device requiring the use of both hands, as provided under Listing 1.16D(1).  The

cited evidence also fails to establish both an inability to use one hand for fine and gross

manipulation and a "documented medical need" for an assistive device that requires the use of

the other hand, as provided under Listing 1.16D(2).  Ms. Secrest fails to explain how the cited

evidence would meet those requirements.  (ECF Doc. 8, pp. 18-19.)  Thus, she has not met her burden to demonstrate that the ALJ erred in finding she did not meet Listing 1.16.

Ms. Secrest argues in the alternative that "[e]ven if Plaintiff did not satisfy each of the elements of the relevant Listing, she equaled the listing."  (ECF Doc. 8, pp. 19-20.)  Her argument here mirrors her prior argument as to the requirements of paragraphs A, B, and C, accompanied by an argument that "her Raynaud's limited the use of her hands."  (*Id.*)  She does not explain how her Raynaud's symptoms "are at least of equal medical significance" to the paragraph D requirements, and relies on the same inadequate evidence discussed above.  The undersigned therefore finds that Ms. Secrest has not met her burden to demonstrate that the ALJ erred when she did not find Ms. Secrest medically equaled Listing 1.16.

"'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen*, 800 F.2d at 545).  Thus, even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477.

For the reasons set forth above, the undersigned finds Ms. Secrest has not met her burden to demonstrate that the ALJ lacked substantial evidence to support her determination that Ms. Secrest did not meet or medically equal Listing 1.16.  Accordingly, the undersigned concludes that Ms. Secrest's third assignment of error is without merit.

E.    **Fourth Assignment of Error: Whether ALJ Complied with Remand Order**

In her fourth assignment of error, Ms. Secrest references the substantive arguments she made in her first and second assignments of error, but adds that the ALJ's decision with regard to

those issues failed to comply with the Remand Order.  (ECF Doc. 8, p. 22.)  Her arguments

reference the following instructions in the Remand Order:

- Further consider the claimant's migraine headache impairment (Social Security Ruling 19-4p).

- Give further consideration to the medical source opinions and prior administrative medical findings, including from Drs. Rivera and Tangeman, pursuant to the provisions of 20 CFR 416.920c.

(Tr. 853.)  Ms. Secrest argues the ALJ did not comply with the Remand Order because she: (1)

failed to explain why the limitations proposed by state agency psychological consultants Drs.

Rivera and Tangeman were not incorporated into the RFC; and (2) failed to consider Ms.

Secrest's migraine headaches.  (ECF Doc. 8, p. 22.)  She otherwise asserts that the relevant

arguments were "dealt with in prior Arguments in this Brief."  (*Id.*)  The Commissioner argues in

response that the ALJ fully complied with the Remand Order.  (ECF Doc. 10, pp. 17, 20.)

### 1.    Whether ALJ Gave Further Consideration to Opinions of 2019 State Agency Consulting Psychological Reviewers

The Appeal Council's direction to "[g]ive further consideration" to the opinion evidence,

including the opinions of Drs. Rivera and Tangeman, was based on the following findings:

The hearing decision does not contain an adequate evaluate [*sic*] of the prior administrative medical findings of State agency medical consultants Aracelis Rivera, Psy.D. [] and Paul Tangeman, Ph.D. [].

Dr. Rivera reviewed the record in February 2019, and Dr. Edwards reviewed the record in July 2019, and both doctors opined, in part, that the claimant is limited to performing 1-3 step tasks which do not require extended periods of close attention to detail []. The Administrative Law Judge considers these opinions, finds them to be persuasive, and discusses how they are supported by the claimant's symptoms and the medical evidence []. However, the residual functional capacity assessed in the decision does not appear to account for all of the limitations opined by Drs. Rivera and Tangeman, and the Administrative Law Judge does not provide any rationale explaining this inconsistency.

Specifically, the claimant's residual functional capacity limits her mentally to simple, routine tasks in an environment free of fast-paced production requirements or strict production quotas and with infrequent changes in job duties with changes

45

explained in advance; and occasional interaction with others (Finding Number 4). These limitations do not sufficiently account for the opined limitations to 1-3 step tasks, and no extended periods of close attention to detail. Moreover, the vocational expert who testified at the claimant's hearing indicated that all of the jobs adopted at step five of the sequential evaluation process require extended attention to detail [].

Therefore, further consideration of the prior administrative medical findings of Drs. Rivera and Tangeman and of the claimant's residual functional capacity is necessary.

(Tr. 852-53 (citations omitted) (emphasis added).)

In her first assignment of error, Ms. Secrest argued that the ALJ erred in when she found the opinions of Drs. Rivera and Tangeman "only partially persuasive" but adopted the opinions of Drs. Rozenfeld and Zeune, even though "[t]he limitations were the same" in all four opinions. (ECF Doc. 8, pp. 12-13.)  As discussed in section VI.B.3., *supra*, the limitations stated in 2019 and 2021 state agency psychological consultant opinions were distinct from one another, and the undersigned found the ALJ accurately and appropriately addressed them as such.

In her fourth assignment of error, Ms. Secrest relies on that earlier argument to support an additional argument that the ALJ "did not comply with the Appeals Council Order of Remand . . . in that she failed to explain why the limitations proposed by the State Agency reviewing psychologists were not incorporated" into the RFC.  (*Id.* at p. 22.)  To the extent this assignment of error is intended to restate the arguments in her first assignment of error, the undersigned concludes the argument lacks merit for the reasons set forth in section VI.B.3., *supra*.  And to the extent that Ms. Secrest is offering a new and distinct argument that the ALJ failed to comply with the Remand Order, the undersigned finds that argument also lacks merit.

The Appeals Council found remand appropriate in part because the ALJ's prior decision found the opinions of Drs. Rivera and Tangeman "persuasive" but "d[id] not appear to account for" their "opined limitations to 1-3 step tasks, and no extended periods of close attention to

detail" in the RFC and "d[id] not provide any rationale explaining the inconsistency."  (Tr. 852.) In the present decision, in contrast, the ALJ: (1) found the same opinions "only somewhat persuasive"; (2) explained that she did not adopt the limitation to one-to-three step tasks because that limitation was "more rigid with regard to the number of tasks[] than was supported by the record"; and (3) explained that she did not adopt the limitation excluding extended periods of close attention to detail because it was "too vague" and "did not provide a clear vocationally relevant limitation when compared to the record as a whole."  (Tr. 777.)  The ALJ thus followed the instructions of the Remand Order, not only by generally giving "further consideration" to the opinions of Drs. Rivera and Tangeman, but also by specifically addressing each of the concerns raised regarding the prior ALJ decision in the Remand Order.

For the reasons set forth above, the undersigned finds Ms. Secrest has not met her burden to show that the ALJ failed to follow the Remand Order's instruction to give "further consideration" to the opinions of Drs. Rivera and Tangeman.

### 2. Whether ALJ Further Considered Plaintiff's Headache Impairment

The Appeal's Council's directive to "[f]urther consider the claimant's migraine headache impairment" was based on the following findings:

> The hearing decision does not contain an adequate evaluation of the claimant's "severe" migraine headache disorder.
>
> The claimant's "migraines" are found to be a "severe" medically determinable impairment (Finding Number 2) and at step three of the sequential evaluation process the Administrative Law Judge finds that this impairment does not medically equal a listed impairment (Decision, pages 4–5; Social Security Ruling 19-4p). However, in assessing the claimant's residual functional capacity, it is unclear from the rationale provided in the body of the decision how the exertional and non-exertional limitations account for the claimant's migraine headache disorder. Specifically, the decision acknowledges that the claimant has headaches, and there are periods of time where she has daily headaches, and then repeats the claimant's testimony reflecting that resting in a dark room will relieve the headaches (Decision, page 7). However, the residual functional capacity does not require the

claimant to perform work in a dark room, and it is otherwise unclear how the exertional and non-exertional limitations account for sometimes daily headaches (The medical evidence documents significant symptoms from these headaches (See, e.g., Exhibit 8F, page 1). <u>There is no further narrative discussion explaining how the residual functional capacity limitations account for the limitations and restrictions resulting from the claimant's "severe" migraine headaches, as required by Social Security Ruling 96-8p.</u>

Therefore, further consideration of the claimant's migraine headache disorder is necessary.

(Tr. 853 (emphasis added).)

Ms. Secrest argues in her fourth assignment of error that "the ALJ did not comply with the Appeals Council Order of Remand . . . in that . . . she failed to consider Plaintiff's migraine headaches," explaining that further argument was set forth earlier in her brief.  (ECF Doc. 8, p. 22.)  Earlier, she had argued that the ALJ erred by "fail[ing] to indicate that per the Order of Remand she had considered SSR 19-4p" and "fail[ing] to find that Plaintiff equaled Listing 11.02B based on the documented headaches."  (*Id.* at pp. 14-15.)  The undersigned already addressed the second argument in section VI.C.2., *supra*, finding Ms. Secrest has not met her burden to show that the ALJ erred by not discussing whether Ms. Secrest's headaches equaled listing 11.02B under SSR 19-4p at Step Three.  That argument will not be revisited herein.

The undersigned therefore turns to Ms. Secrest's additional arguments that the ALJ did not comply with the Remand Order because she "failed to indicate that per the Order of Remand she had considered SSR 19-4p" and "failed to consider Plaintiff's migraine headaches."  (ECF Doc. 8, pp. 14-15, 22.)  Neither argument is well taken.  First, the argument that the ALJ erred by "fail[ing] to indicate that per the Order of Remand she had considered SSR 19-4p" (ECF Doc. 8, p. 14-15) finds no support in the Remand Order, which does not direct the ALJ to consider SSR 19-4p or Listing 11.02 (Tr. 853).

Second, as to whether the ALJ considered Ms. Secrest's headaches, a review of the decision reveals that the ALJ found Ms. Secrest's headaches severe at Step Two of the sequential analysis (Tr. 770), considered her subjective reports of headaches (Tr. 774) and related medical treatment (*id.*), incorporated limitations relating to her headaches into the RFC (Tr. 773), and explained her reasons for incorporating those limitations (Tr. 779-80).  Clearly, the ALJ considered Ms. Secrest's headaches in her new decision.

Looking more specifically at the stated grounds for the remand, the Remand Order indicated it was unclear from the prior ALJ decision "how the exertional and non-exertional limitations [in the RFC] account for the claimant's migraine headache disorder," with "no further narrative discussion explaining how the residual functional capacity limitations account for the limitations and restrictions resulting from the claimant's 'severe' migraine headaches, as required by Social Security Ruling 96-8p."  (Tr. 853.)  As noted above, the new decision corrects this deficiency.  Thus, the ALJ followed the instructions of the Remand Order, not only by generally considering Ms. Secrest's headaches but also by specifically addressing the concerns raised in the Remand Order with regard to the prior ALJ decision.

For the reasons set forth above, the undersigned finds Ms. Secrest has not met her burden to show that the ALJ failed to follow the instructions in the Remand Order to give further consideration to Ms. Secrest's headache impairment.  Accordingly, the undersigned concludes that Ms. Secrest's fourth assignment of error is without merit.

## VII.    Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the

Commissioner's decision.


May 29, 2024


> _/s/Amanda M. Knapp_
> _____
> AMANDA M. KNAPP
> United States Magistrate Judge


## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  _See Berkshire v. Beauvais_, 928 F.3d 520, 530 (6th Cir. 2019); _see also Thomas v. Arn_, 474 U.S. 140 (1985). Dated: April 17, 2023